**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| RHEA FOGGIE, | ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | |
| AMERICAN NATIONAL RED CROSS | ) | Case No. 1:21-cv-0001 (PTG/JFA) |
| LONG TERM DISABILITY PLAN, | ) ) | Hon. Patricia Tolliver Giles |
| *Defendant.* | ) ) ) | |
|  | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

This matter comes before the Court on the parties' Cross-Motions for Summary Judgment on the Administrative Record ("Motions"). *See* Dkts. 18, 25. In this ERISA[1] action, Plaintiff, a former American National Red Cross ("Red Cross") employee, became disabled in February 2006, suffering from a number of conditions that caused her chronic pain. Plaintiff received long-term disability ("LTD") benefits for approximately thirteen years under an ERISA-governed employee welfare benefit plan (the "Plan" or "Defendant")[2] until her benefits were terminated in December 2018. At the time of benefit termination, claims under the Plan were administered by Liberty Life Assurance Company of Boston ("Liberty Life").[3] Plaintiff brings her claim for relief from Liberty

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq.*

[2] Defendant asserts in its Answer that its correct name is not "American National Red Cross Long Term Disability Plan" but rather "Life and Health Benefits Plan of the American Red Cross." *See* Dkt. 4 at 1.

[3] In May 2018, Lincoln National Life Insurance Company acquired Liberty Life Assurance Company of Boston. Dkt. 26 at 6 n.1; AR 4. Documents in the record reference both "Lincoln

1

Life's denial of benefits under 29 U.S.C. § 1132(a)(1)(B) and (a)(3), alleging the Red Cross improperly terminated her LTD benefits and breached its fiduciary duty by failing to provide Plaintiff with her complete claim file when transitioning Claim Administrators.[4]  For the reasons that follow, Defendant's Motion (Dkt. 25) is **GRANTED**, and Plaintiff's Motion (Dkt. 18) is **DENIED**.

## I.   BACKGROUND

### A.  Factual Background

Plaintiff was employed as a Donor Services Technician at the Red Cross from February 17, 2003 to February 17, 2006.   Administrative Record ("AR") 1.  In this role, Plaintiff transported medical supplies to and from blood drives, took medical history of blood donors, and drew blood from donors.  AR 504, 1228.  On February 18, 2006, Plaintiff ceased working due to sacroiliitis, a condition which causes lower back pain.  AR 1.

On October 10, 2006, then-Claim Administrator Aetna Life Insurance Company ("Aetna") notified Plaintiff that she was eligible for monthly LTD benefits of $1,066.65 because she was "totally disabled from [her] own occupation."[5]  AR 330–32.  Aetna informed Plaintiff that on

---

National" and "Liberty Life."  For consistency, the Court will refer to "Liberty Life" as the Plan's Claim Administrator.

[4] In her Complaint (Dkt. 1), Motion for Summary Judgment (Dkt. 18), and Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 19), Plaintiff, at times, refers to actions taken by the Red Cross and Liberty Life.  Neither the Red Cross nor Liberty Life are named as defendants in this action.  Defendant, however, asserts that Liberty Life is the Plan's Claim Administrator, and thus, "was solely responsible for the determination of [Plaintiff]'s eligibility for continued LTD benefits."  Dkt. 26 at 6.

[5] In October 2007, Plaintiff began receiving $813.00 per month in Social Security Disability Insurance ("SSDI") benefits due to osteoarthritis of the knees.  AR 270–87, 510.  On April 1, 2008, Metropolitan Life Insurance ("MetLife") notified Plaintiff that it was adjusting her monthly LTD benefits from $1,066.65 to $253.65 to account for her SSDI benefits.  AR 506–07.

February 18, 2008, she would have to meet a stricter "any occupation" definition of disability that would require her to submit objective medical evidence that she was "unable to perform any reasonable occupation for which [she was] qualified or could become qualified as a result of [her] education, training or experience." AR 330–31. In December 2007, Plaintiff was notified that starting on January 1, 2008, administration of the Plan would transfer from Aetna to Metropolitan Life Insurance ("MetLife"). AR 288.

In December 2016, Liberty Life notified Plaintiff that, beginning January 1, 2017, Liberty Life would be responsible for administering her LTD benefits under the Plan. AR 19. On February 20, 2017, Liberty Life informed Plaintiff via letter that it was reviewing her eligibility for LTD benefits and conducted an initial telephone interview with her. AR 1131, 1256. On March 6, 2017, Liberty Life informed Plaintiff that it was in the process of gathering updated medical records to support her disability claim and requested Plaintiff's authorization to obtain such records from her doctors. AR 1128.

In April and July 2017, Liberty Life referred Plaintiff's claim file for independent physician review by Dr. Lynne Fernandez and Dr. William Jaffe, respectively. AR 1243–44. Dr. Fernandez is board-certified in physical medicine and rehabilitation and evaluated Plaintiff's neck, back, and knee pain and attendant conditions. AR 184–86. Dr. Fernandez voiced agreement with Plaintiff's attending physician, Dr. Jenny Andrus, that Plaintiff could reasonably perform light activity,[6] AR 185, 531, and determined that although Plaintiff's diagnoses supported "functional impairment," a range of restrictions and limitations would enable Plaintiff to work full-time for eight hours per

---

[6] Dr. Andrus was Plaintiff's attending physician from January 2010 through at least 2018. *See, e.g.*, AR 530, 890. In her attending physician statement dated March 3, 2017, Dr. Andrus categorizes Plaintiff as having "[s]light limitation of functional capacity; capable of light work." AR 531.

day.  AR 186.  Dr. Fernandez spoke with Dr. Craig Jenkins, another of Plaintiff's attending

physicians, who agreed with Dr. Fernandez's conclusions as to Plaintiff's capabilities.  AR 189–

90.  Dr. William Jaffe is board-certified in cardiovascular disease and internal medicine and

evaluated Plaintiff's hypertension, diabetes, and hepatitis diagnoses.  AR 203–06.  Dr. Jaffe

concluded that all three of these diagnoses were controlled such that they caused "no functional

impairment" in Plaintiff and did not require imposing any restrictions or limitations on Plaintiff.

AR 205.

On August 10, 2017, Liberty Life notified Plaintiff via letter ("2017 termination letter")

that she no longer met the definition of "disabled" under the Plan and was not eligible for benefits.

AR 42.  The 2017 termination letter stated that Plaintiff had "submitted a claim for chronic

hepatitis, hypertension, and diabetes" and that Plaintiff's claim file contained medical

documentation from various attending physicians and consultations performed between August

18, 2006 and June 8, 2017.  AR 42–43.  The 2017 termination letter explained that although there

was evidence to support Plaintiff's diagnoses of hypertension, diabetes, and hepatitis, there was

no evidence of impairment as to those diagnoses that would prevent Plaintiff from working.  AR

44.  Shortly thereafter, Plaintiff notified Liberty Life that she was appealing its decision to

terminate her LTD benefits.  AR 36–38, 1253–55.  Plaintiff explained that the decision was

erroneously based on conditions—hepatitis, hypertension, and diabetes—that were not the cause

of her disability.  AR 36, 1254.  Plaintiff emphasized that her "main disability" was her knees,

which were not mentioned in the 2017 termination letter.  AR 1254.  Plaintiff alleged that her

double knee replacement, fibromyalgia, and neck disks were erroneously "omitted" from Liberty

Life's review of her medical records.  AR 38.

On August 22, 2017, Liberty Life notified Plaintiff it was reopening her claim to consider

4

"updated records." AR 1252. On October 27, 2017, Plaintiff's claim file was reviewed by Dr. Farjallah Khoury, an independent physician board-certified in physical medicine and rehabilitation. AR 69, 211–14. Dr. Khoury noted that Plaintiff's medical records supported diagnoses of lumbosacral spondylosis, artificial bilateral knee joints, gait abnormality, and chronic fibromyalgia pain syndrome. AR 212. He determined that Plaintiff was impaired, but that a variety of restrictions and limitations would allow her to "work full time in a sustained capacity." AR 213. Dr. Khoury noted that while the prognosis for full-time work with restrictions and limitations was "good," the restrictions and limitations were "likely permanent." *Id.*

On November 6, 2017, a Vocational Consultant, Jenny Irvin, prepared a "Transferable Skills Analysis/Vocational Review" ("TSA") for Plaintiff on behalf of Liberty Life. AR 1226–29, 1239. Irvin noted in the TSA that she had reviewed Dr. Khoury's report and spoken to Plaintiff on the phone about her physical condition and work history. AR 1227–28. The TSA stated that Plaintiff had worked for the Red Cross as a "Phlebotomist" transporting medical supplies to and from blood drives, recording medical history of blood donors, and drawing blood from donors. *Id.* The TSA also noted Plaintiff's prior work history, including positions at a call center for approximately five years and at a dry cleaning business for approximately ten years. AR 1228. The TSA determined that Plaintiff had various "Work Performance Skills" and "Communication Skills" and the following "Administrative/Clerical Skills":

- Able to operate computers and other basic office equipment
- Able to do word processing, data entry and basic formatting of texts
- Able to compile basic information
- Able to design and maintain filing and control systems
- Able to do general office work

*Id.* The TSA concluded that, based on "standard vocational resources including the Dictionary of Occupational Titles (DOT), Occupational Outlook Handbook (OOH), Occupational Information

Network (O*NET) / Standard Occupational Classification (SOC) coding system, Guide for Occupational Exploration (GOE) and Internet job boards," Plaintiff could work as either an Information Clerk or a Gate Guard, occupations that "require[d] an equal or lower level of skill than [Plaintiff]'s occupation as a Phlebotomist at" the Red Cross. AR 1227, 1229. On September 26, 2018, Liberty Life reviewed the TSA with Irvin and confirmed that the occupations and wages listed therein were "viable." AR 1238.

In late 2018, Liberty Life received updated medical records from Plaintiff's attending physicians, which included office and procedure notes from physician and urgent care visits between January and September 2018. *See, e.g.*, AR 793–1115, 1187–1214. On October 30, 2018, Plaintiff's claim file was reviewed by Dr. Howard Grattan, an independent physician board-certified in physical medicine and rehabilitation and pain management. AR 215–20, 1237. Dr. Grattan found that Plaintiff's medical records supported diagnoses of sacroiliitis, chronic pain syndrome, neck pain, right upper extremity pain, chronic knee pain, lumbar spondylosis, chronic back pain, bilateral grater trochanter bursitis, and fibromyalgia, and that Plaintiff's chronic pain syndrome, neck pain, chronic knee pain, lumbar spondylosis, and chronic back pain were causing her impairment. AR 218. Although Dr. Grattan noted Plaintiff's surgical history involving her spine and knees, an antalgic gait, tenderness, and decreased range of motion, he concluded that Plaintiff could sustain full-time employment subject to a number of restrictions and limitations. AR 219. Based on the TSA and Dr. Grattan's report, Liberty Life concluded that Plaintiff was not totally disabled such that she was prevented from working in any occupation. AR 1237.

On November 20, 2018, Liberty Life notified Plaintiff via letter ("2018 termination letter") that Plaintiff was not eligible for benefits beyond May 31, 2033 because, as of August 16, 2008,

she no longer met the definition of "disabled" under the Plan.[7]  AR 47, 52.  The 2018 termination

letter stated that Plaintiff's disability claim was based on her "sacroiliitis, chronic pain syndrome,

neck pain, right upper extremity pain, chronic knee pain, lumbar spondylosis, chronic back pain,

bilateral greater trochanter bursitis, and fibromyalgia" and that her claim file contained medical

documentation dated between January 17, 2018 and October 9, 2018.  AR 48.  The 2018

termination letter explained that Plaintiff's claim file had been reviewed by a consulting physician

and that the following restrictions and limitations supported Plaintiff's ability to work an eight-

hour day/forty-hour week:

- Lifting, carrying, pushing and pulling 20 pounds occasionally (5 to 33% of the time) and 10 pounds frequently (33- 66% of the time)
- Walking and standing for up to 30 minutes at a time for a total of 4 hours per day
- Sitting unrestricted[]
- Occasionally (5-33% of the time) twisting, bending, kneeling, crouching, and squatting
- Occasionally (5 to 33% of the time) climbing stairs
- No climbing ladders or poles, and no working at heights
- No restrictions with reaching, fingering, handling or feeling

AR 48, 51.  The 2018 termination letter informed Plaintiff that her claim file was also reviewed

by a Vocational Specialist to determine her "current capabilities, training, education, and

experience."  AR 51.  The 2018 termination letter concluded that Plaintiff could "perform, with

reasonable continuity, the material and substantial duties of" an Information Clerk (national mean

monthly wage of $2,426.00) and a Gate Guard (national mean monthly wage of $2,485.00), and

thus, did not meet the Plan's definition of disability.  AR 51–52.

On November 28, 2018, Plaintiff notified Liberty Life via letter that she intended to appeal

---

[7] Defendant admits that these dates are erroneous.  Dkt. 26 at 28.  The correct date on which LTD benefits terminated is December 9, 2018, which is the date provided in Liberty Life's first and second appeal determination letters.  AR 56, 65.

the decision to terminate her LTD benefits.  AR 27.  On March 1, 2019, Liberty Life notified
Plaintiff via letter ("first appeal letter") that it was upholding its determination to deny Plaintiff
LTD benefits beyond December 9, 2018.  AR 56.  The first appeal letter explained that, as part of
the appeal, Plaintiff's claim file was reviewed by Dr. Michelle Alpert, an independent physician
board-certified in physical medicine and rehabilitation and spinal cord injury medicine.  AR 59.
The first appeal letter noted that Dr. Alpert had discussed Plaintiff's medical history, diagnoses,
and conditions with Dr. Jeremy Williams, who had treated Plaintiff in late 2018.  AR 59, 170–71.
The first appeal letter explained that both Dr. Alpert and Dr. Williams agreed Plaintiff was capable
of working full time.  AR 60.  The first appeal letter conveyed some of Dr. Alpert's medical
findings, which included her opinion that Plaintiff:  showed "no evidence of neurologic deficits on
examination or functional impairments that would support the need for any restrictions and
limitations"; was "fully ambulatory, used no devices, and had no upper extremity issues"; and
complained of back, neck, knee, and hip pain but "without evidence of any resulting physical
impairments."[8]  AR 60.

On May 4, 2019, Plaintiff submitted a second appeal to Liberty Life.[9]  AR 32–35.  On July
8, 2019, Liberty Life notified Plaintiff via letter ("second appeal letter") that it was again upholding

---

[8] Dr. Alpert's report additionally noted that despite Plaintiff's persistent claims of pain, no imaging
studies, examinations, or X-rays revealed "gross instability" or "significant abnormalities," and
that Plaintiff's "prior disability forms overstate her limitations."  AR 178–79.  Dr. Alpert
highlighted that in an October 2018 questionnaire, Plaintiff stated she did her own vacuuming,
laundry, and grocery shopping, which Dr. Alpert noted was "quite a functional improvement and
significant progress."  AR 179.  Dr. Alpert concluded that Plaintiff "had the ability to return to full
time work capacity without any supported restrictions or limitations" and opined that "returning
to work . . . would likely be effective management for her unrelenting pain complaints and
fibromyalgia."  Id.

[9] Liberty Life noted that the only additional documentation submitted by Plaintiff in connection
with her second appeal was a written certification from the Maryland Medical Cannabis
Commission dated December 12, 2018 and signed by Dr. Randy DeCarlo.  AR 66.

its determination to deny payment of Plaintiff's LTD benefits.  AR 65.  The second appeal letter

explained that, as part of the second appeal, Plaintiff's claim file was reviewed by Dr. Ephraim

Brenman, an independent physician board-certified in physical medicine and rehabilitation and

pain medicine.  AR 71–72.  The second appeal letter stated that Dr. Brenman reviewed Plaintiff's

medical records and history and concluded that:

> The claimant can lift and carry up to 20 pounds occasionally and 10 pounds
> frequently.
> The claimant can sit up to 8 hours a day up to 1 hour at a time, needs 2-minute for
> break every hour for reposition and stretch.
> The claimant can reach overhead occasionally.
> The claimant can squat occasionally.
> The claimant cannot crawl, climb ladders, or work on uneven or slippery surfaces.
> The claimant can stand/ and walk up to 4 hours a day each, up to 30 minutes at a
> time each, needs a 2-minute for break after 30 minutes of walking/standing.
> The claimant can go up and down stairs occasionally.

AR 72.  The second appeal letter conveyed Dr. Brenman's conclusion that Plaintiff "ha[d] the

ability to sustain full time [work] capacity" within the aforementioned restrictions and

limitations.[10]  *Id.*  Thus, the second appeal letter explained Liberty Life's position remained that

Plaintiff had not provided proof of "continued disability" under the Plan such that she was entitled

to LTD benefits after December 9, 2018.  AR 73.  The second appeal letter informed Plaintiff that

as she had exhausted her administrative right to review, her claim would be closed.  AR 74.

### B. Procedural Background

On January 4, 2021, Plaintiff filed a complaint for disability benefits under ERISA in the

United States District Court for the Eastern District of Virginia.  Complaint, Dkt. 1.  On July 13

and August 13, 2021, Plaintiff and Defendant, respectively, filed Motions for Summary Judgment

---

[10] Dr. Brenman's report additionally determined that Plaintiff had "no neurological deficits," no
"cervical or lumbar radiculopathy," and no "significant problems" with the implants or hardware
in her knees.  AR 199.  He also opined that the severity and scope of Plaintiff's reported pain was
inconsistent with the severity and scope of Plaintiff's documented medical conditions.  *Id.*

on the Administrative Record. *See* Dkts. 18, 25. On November 17, 2021, this case was reassigned to Judge Patricia Tolliver Giles.

## II.   LEGAL STANDARD

### A.  Motion for Summary Judgment on the Administrative Record

Summary judgment will be granted where, viewing the facts in the light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Marlow v. Chesterfield Cnty. Sch. Bd.*, 749 F. Supp. 2d 417, 426 (E.D. Va. 2010). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists, and that summary judgment should not be granted in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### B.  Framework of Review Under ERISA

In cases involving a denial of benefits under an employee benefit plan governed by ERISA, the Court applies a unique framework specific to ERISA benefits cases. This framework requires the Court to consider the denial of benefits under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995) (internal quotation marks omitted) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "[A]n ERISA plan can confer discretion on its administrator in two ways: (1) by language which 'expressly creates discretionary authority,' and (2) by terms which 'create discretion by implication.'" *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008) (quoting *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522–23 (4th Cir. 2000)). Regardless of whether discretion is conferred expressly or by implication, the plan must "manifest

a clear intent to confer such discretion." *Id.* When determining whether an ERISA plan confers

discretion on its administrator, ambiguity is "construed against the drafter of the plan . . . and in

accordance with the reasonable expectations of the insured." *Id.* (internal quotation marks omitted)

(quoting *Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 269 (4th Cir. 2002)).

## III.   DISCUSSION

### A.  Standard of Review – Abuse of Discretion

Plaintiff argues that the Court should review Liberty Life's decision *de novo*, affording it

no deference, while Defendant argues for an abuse of discretion standard.   Determining the

standard of review necessarily requires examining the language of the Plan to ascertain "whether

the provision of benefits is prescriptive or discretionary and, if discretionary, whether the plan

administrator acted within its discretion." *Booth v. Wal-Mart Stores, Inc. Assocs. Health &*

*Welfare Plan*, 201 F.3d 335, 343 (4th Cir. 2000).  However, as the Eighth Circuit has observed,

identifying what documents constitute the ERISA plan "is not always a clear-cut task." *MBI*

*Energy Servs. v. Hoch*, 929 F.3d 506, 509 (8th Cir. 2019) (internal quotation marks omitted)

(quoting *Admin. Comm. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Gamboa*, 479

F.3d 538, 542 (8th Cir. 2007)); *see also Woods*, 528 F.3d at 322 (noting that the court's first inquiry

is to consider "whether the relevant *plan documents* confer discretionary authority on the plan

administrator to make a benefits-eligibility determination" (emphasis added)).

The AR in this case contains (1) the Summary Plan Description ("SPD") and Certificate of

Group Coverage ("Certificate") that were in effect at the time of Liberty Life's 2018 termination

decision ("2018 Plan"); and (2) the SPD and Certificate that were in effect when Plaintiff first

became disabled in 2006 ("2006 Plan").  Beyond the SPD and Certificate, the AR does not contain

other Plan documents.  Defendant contends that the SPD and Certificate for the 2018 Plan are "the

11

relevant documents." Dkt. 26 at 35.  Although Plaintiff argues that the "applicable Plan" is the 2006 Plan, she does not dispute Defendant's contention that the SPD and Certificate are the relevant Plan documents.  Dkt. 19 at 17; *see also* Dkt. 11.  Prior to determining which standard of review applies, the Court must determine which Plan applies.

### 1.  The 2018 Plan Applies

Plaintiff argues that the 2006 Plan is the relevant Plan and does "not contain any language purporting to confer discretion to the claim administrator." Dkt. 19 at 17.  Defendant disagrees, pointing to language from the 2006 Plan it claims conferred discretionary authority by implication on then-claim administrator Aetna.  Dkt. 26 at 21.  Defendant further argues that even if the 2006 Plan did not confer discretionary authority on Aetna, the Red Cross had the right to amend the Plan, and the 2018 Plan conferred express discretionary authority on Liberty Life. *Id.* at 22.  Plaintiff is correct that the 2006 Plan did not confer discretionary authority on Aetna. *See Woods*, 528 F.3d at 323.  Plaintiff, however, errs in her assertion that the 2006 Plan governs this Court's standard of review analysis.

As an employer, the Red Cross enjoys "flexibility . . . to amend or eliminate its welfare plan." *Inter-Modal Rail Emps. Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 515 (1997).  The Red Cross may "waive its statutory right to modify or terminate benefits . . . by voluntarily undertaking an obligation to provide vested, unalterable benefits to plan participants." *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994) (internal quotation marks and brackets omitted).  "Because such an obligation constitutes an extra-ERISA commitment, however, courts may not lightly infer the existence of an agreement to vest employee welfare benefits." *Id.*  An agreement to provide vested benefits must be "found in the plan documents and must be stated in clear and express language." *Id.* (internal quotation marks

omitted).  The 2006 Plan expressly states that the "Red Cross reserves the right to change or terminate this plan at any time," AR 1395, and that "this Plan may be changed or discontinued with respect to all or any class of employees," AR 1412.  No language in the 2006 Plan qualified or limited the Red Cross' right to change or terminate the Plan, or purported to provide plan participants with vested benefits.  Consistent with its right to amend, the Red Cross amended the Plan, effective January 1, 2018.  AR 1262.  Thus, the Court finds that the 2018 Plan, not the 2006 Plan, controls in determining whether the Plan conferred discretionary authority on Liberty Life.[11]

### 2.  The 2018 Plan Provides Discretionary Authority

An SPD is a plan document relevant to the interpretation of an ERISA plan.  *See Pegram v. Prudential Ins. Co.*, No. 3:08-cv-116, 2009 WL 1974942, at *4–5 (E.D. Va. July 2, 2009) (finding that the language of the SPD conferred discretionary authority on the claim administrator and applying a deferential standard of review).  The Fourth Circuit has not directly addressed the question of whether an SPD and Certificate alone, without other formal plan documents, may constitute the terms of an ERISA plan in deciding whether that plan confers discretionary authority on its administrator for the purposes of determining the standard of review.  In at least one case, however, the Fourth Circuit referred to the SPD as constituting the language of an ERISA plan because the SPD was the "governing plan document."  *Kress v. Food Emps. Lab. Rels. Ass'n*, 391

---

[11] The Fourth Circuit cases Plaintiff cites in her Reply Brief, *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 641 (4th Cir. 2007), and *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 637–38 (4th Cir. 1995), are inapposite.  Both cases involved vested rights and neither case considered the denial of LTD benefits:  *Blackshear* involved life insurance payments to a plan participant's beneficiary and *Wheeler* involved medical insurance coverage of treatment undergone by a plan participant's spouse.  *See Blackshear*, 509 F.3d at 641; *Wheeler*, 62 F.3d at 637.  As discussed above, the present case does not involve vested rights.

F.3d 563, 566, 568 (4th Cir. 2004).[12]  Other district courts within this Circuit have found that an

SPD can confer discretionary authority on an administrator for the purposes of determining the

standard of review.[13]  *See, e.g., Pettit v. Life Ins. Co. of N. Am.*, No. CV RDB-15-2694, 2016 WL

3668022, at *5 (D. Md. July 11, 2016) (internal quotation marks omitted) (quoting *Klebe v. Mitre*

*Grp. Health Care Plan*, 894 F. Supp. 898, 902 (D. Md. 1995), *aff'd*, 91 F.3d 131 (4th Cir. 1996))

(stating "that a requisite grant of discretion may be derived from any number of plan documents,

including the plan itself, summary descriptions, contracts, and the like"); *Wilkinson v. Sun Life &*

*Health Ins. Co.*, 127 F. Supp. 3d 545, 558 (W.D.N.C. 2015), *aff'd*, 674 F. App'x 294 (4th Cir.

2017) (considering the SPD in determining the standard of review and stating that courts were not

prohibited "from considering multiple Plan documents, such as statutorily required summary

documents consistent with the terms of the plan itself, in determining whether or not a Plan

administrator or fiduciary was given discretionary authority for purposes of the standard of

review").

     Thus, in the present case, where Defendant contends that the SPD and Certificate are the

relevant Plan documents and Plaintiff does not dispute this contention, and "the SPD is the only

---

[12] *But see Woods*, 528 F.3d at 322 n.3 (remarking that both parties had "acknowledge[d]" that language in the SPD was "not relevant" to the Court's inquiry as to whether the plan conferred discretionary authority on the administrator because "it is not contained in the Plan itself").

[13] Several circuits have held that in the absence of other formal plan documents the terms of an SPD may constitute the plan itself. *See, e.g., Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*, 858 F.3d 340, 345 (5th Cir. 2017) (holding that "where a plan has an SPD but no separate written instrument, the SPD can serve as the plan's written instrument"); *Bd. of Trustees v. Moore*, 800 F.3d 214, 219 (6th Cir. 2015) (finding that the SPD set forth the terms of the plan); *Eugene S. v. Horizon Blue Cross Blue Shield*, 663 F.3d 1124, 1132 (10th Cir. 2011) (finding that the language in the SPD was the language of the plan); *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) (finding that "the Program Summary and its accompanying memorandum were 'the plan' for purposes of the plaintiffs' actions under § 1132(a)(1)(B)"); *Mull for Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1209–10 (9th Cir. 2017) (finding that the Trust Agreement and SPD together constituted the plan).

benefit-providing Plan document," *Hoch*, 929 F.3d at 511, with no conflicting Plan documents, the Court regards the SPD and Certificate as the "governing plan document[s]" setting forth the terms of the Plan. *Kress*, 391 F.3d at 566; *see also Dudley v. Sedgwick Claims Mgmt. Servs. Inc.*, 495 F. App'x 470, 471 n.1 (5th Cir. 2012) ("Because neither party points to an alternative plan document in the record, both parties rely on the [SPD] as the governing text, and only a plan can be enforced under § 1132(a)(1)(B), we treat the [SPD] as the plan."); *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 92 n.1 (2013) ("Because everyone in this case has treated the language from the summary description as though it came from the plan, we do so as well.").

The SPD explicitly states that the Plan Administrator, i.e., the Red Cross, "has delegated to each Claim Administrator the authority and discretion to make all decisions on claims for benefits under the Plan option for which it is responsible, including to make decisions with respect to the appeal of denied claims for benefits." AR 1263. The SPD also explains:

> With respect to claims for benefits, the Plan Administrator has delegated to the applicable insurance company or professional administrative services provider with respect to a benefit *the sole authority, discretion and responsibility to determine claims for benefits*, which includes interpreting the Plan and, as applicable, the insurance contract or document describing the terms of the benefit, and making factual decisions to decide whether and in what amount a benefit shall be paid. Such insurance company or administrative services provider is referred to as the "Claim Administrator," and shall make all determinations on both initials claims and appeals with respect to benefits. All of its decisions shall be final, except to the extent that they are appealed.

AR 1294 (emphasis added). If the benefit plan confers discretionary authority on its administrator, the Court's review is limited to the issue of whether the administrator abused its discretion in denying the claim. *Bernstein*, 70 F.3d at 787. Under an abuse of discretion standard, the Court will not reverse an administrator's decision if it is reasonable, that is, if it "result[ed] from a 'deliberate, principled reasoning process' and [is] supported by substantial evidence." *Williams v. Metro Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) (quoting *Guthrie v. Nat'l Rural Elec. Coop.*

*Assoc. Long Term Disability Plan,* 509 F.3d 644, 651 (4th Cir. 2007)).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel,* 270 F.3d 171, 176 (4th Cir. 2001) (internal quotation marks omitted).   Substantial evidence consists of "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotation marks omitted).   The plaintiff bears the burden of proving an administrator abused its discretion. *Case v. Cont'l Cas. Co.,* 289 F. Supp. 2d 732, 737 (E.D. Va. 2003).

The Fourth Circuit uses an eight-factor test to determine whether an administrator's decision was reasonable and based on substantial evidence:  (1) the plan language; (2) the purposes and goals of the plan; (3) adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions of the plan and earlier interpretations of the plan; (5) whether the decision-making process was reasonable and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth,* 201 F.3d at 342–43.   Finally, the Court may only consider the evidence that was before the claim administrator at the time it rejected the claim. *See Bernstein,* 70 F.3d at 788.   In other words, in evaluating the claim administrator's decision, the Court is constrained to the administrative record.

Because the Plan gives the Claim Administrator, i.e., Liberty Life, the discretion to make benefits decisions, this Court cannot disturb Liberty Life's decision if it is reasonable, even if the Court, independently, would have come to a different conclusion. *Booth,* 201 F.3d at 344 (citing *Firestone,* 489 U.S. at 115).   This confines the Court's decision to determining whether Liberty

Life's decision to terminate Plaintiff's LTD benefits was an unreasonable exercise of discretion. *Id.*

The Plan provides LTD benefits to "[a]ll regular, active, full-time employees" who become disabled after the "Elimination Period," which is the greater of the end of short-term disability ("STD") benefits or 180 days. AR 1347–48, 1352–53. Under the Plan, a claimant is "Disabled" if, (1) for the Elimination Period and the next twenty-four months of disability, the claimant, "as a result of Injury or Sickness, [is] unable to perform the Material and Substantial Duties of [her] Own Occupation; and" (2) thereafter, the claimant is "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."[14] AR 1352. Liberty Life will pay monthly LTD benefits to a claimant upon receipt of proof of continued disability, regular physician visits, and appropriate available treatment. AR 1364. Claimants are responsible for submitting proof or "evidence in support of a claim for benefits" to Liberty Life, which can include but is not limited to: a claim form signed by the claimant, a signed attending physician's statement, and "other forms of objective medical evidence" like "standard diagnosis, chart notes, lab findings, test results, [and] x-rays" relied upon by the attending physician. AR 1358. Monthly LTD benefits will be discontinued if a claimant, in relevant part, is "no longer Disabled according to" the Plan. AR 1375.

In analyzing the reasonableness of Liberty Life's termination decision, the parties' arguments primarily relate to three *Booth* factors, namely (3) the adequacy of the materials

---

[14] A claimant's "Own Occupation" is the one she was performing at the time of disability "as it is normally performed in the national economy." AR 1356. "Any Occupation" means "any occupation" that the claimant is or becomes "reasonably fitted [for] by training, education, experience, age, physical and mental capacity." AR 1351. The "Material and Substantial Duties" are those "responsibilities that are normally required" of an occupation and that "cannot be reasonably eliminated or modified." AR 1355.

considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; and (6) whether the decision was consistent with the procedural and substantive requirements of ERISA. *Booth*, 201 F.3d at 342–43.

### B. Liberty Life's Termination Decision was not Inconsistent with Previous Interpretations of the Plan

One factor in determining the reasonableness of a claim administrator's decision is if it is inconsistent with previous interpretations of the plan. *Booth*, 201 F.3d at 342. Plaintiff argues that Liberty Life's termination decision is inconsistent with previous interpretations of the Plan because her "medical information, training, education and experience history" was "identical" from 2008 to 2018. Dkt. 19 at 18. Plaintiff emphasizes that neither her physical capacity nor her work experience changed, and the only "substantive" thing that changed was Liberty Life taking over from MetLife as Claim Administrator. *Id.* at 18–19. In other words, Plaintiff argues that because Liberty Life reached an opposite (i.e., adverse) benefits decision from Aetna and MetLife on the same evidence, Liberty Life's decision is "inconsistent with previous interpretations of the Plan." Plaintiff does not cite to the administrative record to support her claim, and her argument fails because she is incorrect in alleging that there was no change in the evidence between 2008 and 2018. A review of the administrative record reveals not only changes in Plaintiff's medical condition and physical capacity, but also the addition of new evidence from six consulting physicians and a TSA by a Vocational Consultant. Thus, Liberty Life's 2018 termination decision reflected this change in the evidence as opposed to an inconsistency with prior decisions.

Plaintiff's condition did, in fact, change in the years leading up to Liberty Life's 2018 termination decision. For example, Dr. Andrus, one of Plaintiff's attending physicians, stated in office notes from October 2015 that although Plaintiff reported "continuous" knee pain, she also

reported "some improvement with sitting." AR 540. Dr. Andrus recommended that Plaintiff receive "genicular nerve blocks to target her knee pain," a procedure Plaintiff received in both knees in November 2015. AR 542–44. Dr. Andrus noted in March 2016 that Plaintiff saw "significant improvement in her pain symptoms to the right knee" from the genicular nerve block and recommended repeating the procedure in the future as needed.[15] AR 548. Between 2015 and 2018, Plaintiff also reported neck, hip, and back pain, for which she received consistent injections. AR 538–39, 545–48, 712, 882. In May 2016, Plaintiff underwent an anterior cervical discectomy and fusion ("ACDF") procedure to correct a herniated disc in the cervical spine. AR 549–54, 559, 566–70. Dr. Mark McFarland,[16] the surgeon who performed the procedure, noted no complications after the procedure, and Plaintiff was discharged in good condition. AR 569, 571. In the days, weeks, and months following the ACDF procedure, Dr. McFarland noted that Plaintiff was "doing well" and "continue[d] to improve" and did not report any other concerns. AR 574–85. In November 2016, six months post-procedure, Dr. McFarland noted that Plaintiff was "very happy with her outcome," that she did not feel that any further treatment was needed, and that she self-reported "she is at least 90% better." AR 586. In March 2018, Plaintiff suffered a concussion, whiplash, and injuries to her wrists and knees from a car accident, but reported to Dr. Andrus in July 2018 that her neck pain was "manageable." AR 877; *see also* AR 973–99.

Beyond changes in Plaintiff's physical condition, there were changes in the opinions of Plaintiff's attending and treating physicians, as well as new opinions from consulting physicians. In as early as 2016 and as late as 2019, several of Plaintiff's attending physicians and other treating

---

[15] Plaintiff repeated the genicular nerve block procedure in her knees in 2016, 2017, and 2018. AR 594–95, 799–800, 883–84.

[16] Dr. McFarland also performed both of Plaintiff's knee replacements. AR 804.

physicians opined that Plaintiff could ambulate, perform activities of daily living ("ADLs"), and/or work.[17]  In reviewing Plaintiff's benefits claim, Liberty Life solicited independent reviews of Plaintiff's claim file from four physicians (Drs. Fernandez, Jaffe, Khoury, and Grattan) before reaching its 2018 termination decision and solicited two additional independent reviews (by Drs. Alpert and Brenman) during Plaintiff's subsequent appeals; all six consulting physicians concluded that Plaintiff had the capacity to work, subject to certain restrictions and limitations. AR 174–87, 193–206, 211–20.  On November 7, 2017, Liberty Life also hired a Vocational Consultant to perform a TSA; the TSA discussed Plaintiff's skillset and identified two occupations Plaintiff could reasonably perform.  AR 1227–29.

The changes in Plaintiff's condition (as evidenced by physicians' office and procedure notes and medical reports), opinions of Plaintiff's attending and treating physicians (as evidenced in physician office notes and by conversations with consulting physicians), six independent physician reports, and the 2017 TSA constitute new evidence.  It is upon this *new* evidence that Liberty Life based its 2018 termination decision.  Therefore, Liberty Life's termination decision is not inconsistent with previous interpretations of the Plan.

### C. Liberty Life's Termination Decision was Supported by Adequate Materials

A claim administrator's decision must be supported by adequate and substantial evidence. *Hailey v. Verizon Commc'ns Long Term Disability Plan*, No. 1:13-CV-001528-GBL, 2014 WL

---

[17] On March 4, 2016, treating physician Dr. James Thompson noted, "I see no specific reason for her to sit at home.  There are many patients with worse pain and conditions that still manage to work." AR 688.  On March 3, 2017, attending physician Dr. Andrus categorized Plaintiff as having "[s]light limitation of functional capacity; capable of light work." AR 531.  On April 17, 2017, attending physician Dr. Jenkins agreed with consulting physician Dr. Fernandez as to Plaintiff's capabilities and opined that Plaintiff could "walk and perform ADLs." AR 189–90.  On February 20, 2019, treating physician Dr. Williams agreed with consulting physician Dr. Alpert that Plaintiff was "ambulatory," "able to stand and sit without difficulty," had "no issues with her upper extremities," and had "no functional or physical impairments." AR 170–71.

5421242, at *5 (E.D. Va. Oct. 22, 2014) (citing *Helton v. AT&T, Inc.*, 709 F.3d 343, 358–59 (4th Cir. 2013)).  Substantial evidence is evidence that "a reasoning mind would accept as sufficient to support a particular conclusion." *Id.* (quoting *Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 295 (4th Cir. 2006) (unpublished)).  From a quantity perspective, substantial evidence is "more than a scintilla but less than a preponderance." *Brooks v. Hartford Life & Accident Ins. Co.*, 525 F. Supp. 3d 687, 699 (E.D. Va. 2021) (internal quotation marks omitted) (quoting *Newport News Shipbuilding & Dry Dock Co. v. Cherry*, 326 F.3d 449, 452 (4th Cir. 2003)).

Plaintiff argues that the Court should not uphold Liberty Life's 2018 termination decision because the decision is not supported by the evidence.  Dkt. 19 at 18.  The materials on which Liberty Life based its termination decision—Plaintiff's updated medical records, six independent physician peer review reports, and the 2017 TSA (which are described in-depth in the previous section)—constitute substantial evidence as (1) its quantity represents more than a scintilla and (2) a reasoning mind would accept the materials as sufficient to support the conclusion that Plaintiff was not disabled and was capable of working.

Plaintiff specifically takes issue with the TSA completed by Vocational Consultant Jenny Irvin, asserting that the TSA is not supported by "any evidence whatsoever" and that Irvin did not "show her work" in the TSA.  Dkt. 19 at 20–24.  Plaintiff, however, cites no authority that requires a Vocational Consultant to "show their work" in creating a TSA, and a claim administrator is not required to perform or consider a vocational review before rendering a benefits decision.  *See Piepenhagen v. Old Dominion Freight Line, Inc.*, 395 F. App'x 950, 957 (4th Cir. 2010) (unpublished).

Moreover, it is untrue that the TSA is unsupported by the evidence.  Irvin noted in the TSA that she had reviewed Dr. Khoury's October 27, 2017 report.  AR 1227.  In his report, Dr. Khoury

21

noted that the medical evidence supported Plaintiff's diagnoses of "lumbosacral spondylosis, presence of artificial bilateral knee joints, gait abnormality, and chronic fibromyalgia pain syndrome." AR 212. Dr. Khoury concluded, however, that Plaintiff could "work full time in a sustained capacity." AR 213. Based on Plaintiff's diagnoses, Dr. Khoury recommended specific restrictions and limitations for Plaintiff, including: pushing, pulling, lifting and carrying twenty-five pounds occasionally and fifteen pounds frequently; standing for thirty minutes, followed by five minutes of rest, for two hours per work shift; walking for thirty minutes, followed by five minutes of rest, for two hours per work shift; and avoiding crawling, kneeling, squatting, and climbing ladders. *Id.* Dr. Khoury also noted that Plaintiff did not require any restrictions or limitations for sitting. *Id.* Thus, in creating the TSA, Irvin was aware of Plaintiff's medical diagnoses and the restrictions and limitations on her physical capabilities recommended by a consulting physician. Irvin also spoke with Plaintiff on the phone about her physical condition and work history. AR 1228, 1239. Irvin explained that based on Plaintiff's "education, training and physical capacities[,]" she concluded that Plaintiff could work as an Information Clerk or Gate Guard.[18] AR 1229. Irvin noted that both of these occupations required "an equal or lower level of skill" than Plaintiff's position with the Red Cross. *Id.* While Plaintiff is correct that the TSA does not list the specific responsibilities for these occupations, Dkt. 19 at 22, it is reasonable to

---

[18] Irvin noted that she researched "standard vocational resources including the Dictionary of Occupational Titles (DOT), Occupational Outlook Handbook (OOH), Occupational Information Network (O*NET) / Standard Occupational Classification (SOC) coding system, Guide for Occupational Exploration (GOE) and Internet job boards." AR 1227. The DOT "is an appropriate tool for defining an applicant's occupation and job duties" when determining if that applicant is disabled and prevented from performing their *own* occupation. *Sapp v. Liberty Life Assurance Co. of Bos.*, 210 F. Supp. 3d 846, 851 (E.D. Va. 2016). Whether Plaintiff was capable of performing her own occupation is not the relevant inquiry in this case. However, the DOT is still an appropriate and useful tool in determining whether there were *any* occupations Plaintiff was capable of performing.

conclude that the responsibilities for these occupations are within Plaintiff's physical capacity (as set forth in Dr. Khoury's report and discussed in Irvin's phone conversation with Plaintiff) and skillset (as expressly listed in the TSA, *see* AR 1228).[19]

Not only is the TSA reasonably supported by the evidence, but it is also only one piece of evidence on which Liberty Life relied in reaching its termination decision. Taken as a whole, the materials Liberty Life considered supported its termination decision. As discussed above, several of Plaintiff's attending physicians and treating physicians opined that Plaintiff could ambulate, perform ADLs, and/or work, *see* AR 189–90, 531; *see also* AR 170–71, 688, and all six consulting physicians concluded that Plaintiff had the capacity to work, with certain restrictions and limitations, AR 174–87, 193–206, 211–20. Thus, Liberty Life's conclusion that Plaintiff was not "disabled" under the Plan was supported by substantial evidence.

### D. Liberty Life's Termination Decision was Consistent with ERISA

Another factor to consider when determining the reasonableness of a claim administrator's decision is "whether the decision was consistent with the procedural and substantive requirements of ERISA." *Booth*, 201 F.3d at 342–43. Under ERISA, a plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits . . . has been denied, setting forth the specific reasons for such denial." *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 235 (4th Cir. 2008) (internal quotation marks omitted) (citing 29 U.S.C. § 1133). When it denies benefits, the plan must also provide a claimant with the opportunity for "a full and fair review" of her claim, which includes "the opportunity for the claimant to appeal the adverse benefits

---

[19] Plaintiff also argues that she is unqualified for these jobs because they require "a very different skill set" from her prior job. Dkt. 19 at 22. But "the fact that the identified positions, like any other new position, might require initial orientation d[oes] not disqualify them as suitable alternative occupations for which [Plaintiff] [i]s qualified." *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 382 (4th Cir. 2018).

determination and to submit written comments or records[;]" "reasonable access to documents relevant to her claim[;]" and an appeal process that "take[s] into account all relevant information submitted by the claimant." *Id.* (citing 29 C.F.R. § 2560.503–1(h)(1–2) (2008)).  Plaintiff contends that Liberty Life denied her a full and fair review because Liberty Life (1) did not adequately communicate in the 2018 termination letter its reasons for denying her benefits and (2) did not timely provide her with her complete claim file.  Dkt. 19 at 24, 28.

Despite Plaintiff's arguments, Liberty Life's November 20, 2018 letter provided her with adequate notice of and sufficiently set forth the specific reasons for Liberty Life's denial of LTD benefits.  The letter explained that the medical evidence, including Plaintiff's diagnoses, history, and present physical condition, supported a number of restrictions and limitations, including:

- Lifting, carrying, pushing and pulling 20 pounds occasionally (5 to 33% of the time) and 10 pounds frequently (33- 66% of the time)
- Walking and standing for up to 30 minutes at a time for a total of 4 hours per day
- Sitting unrestricted[]
- Occasionally (5-33% of the time) twisting, bending, kneeling, crouching, and squatting
- Occasionally (5 to 33% of the time) climbing stairs
- No climbing ladders or poles, and no working at heights
- No restrictions with reaching, fingering, handling or feeling

AR 51.  The letter explained that a TSA performed by a Vocational Consultant determined that Plaintiff possessed a range of skills and could work as an Information Clerk or Gate Guard.  AR 51–52.  The letter stated that, based on Plaintiff's file, Liberty Life had determined that Plaintiff could "perform, with reasonable continuity, the material and substantial duties of [Information Clerk and Gate Guard] based on [her] capacity and skill level."  AR 52.  Because Liberty Life determined that Plaintiff could work as an Information Clerk or Gate Guard, the letter concluded, she did not meet the definition of "disabled" under the Plan.  *Id.*  This information was sufficiently specific to put Plaintiff on notice as to the reason Liberty Life was denying her benefits:  because

24

she was no longer "disabled" within the Plan's definition as she possessed the physical capacity and skills to work full-time in at least two separate occupations, subject to certain restrictions and limitations. Because the information provided by the 2018 termination letter was specific and sufficient to enable Plaintiff the reasonable opportunity to seek a full and fair review of her claim, it is consistent with ERISA's notice requirements. *See* 29 C.F.R. § 2560.503-1(g).

Plaintiff also argues that Liberty Life's 2018 termination letter failed to inform her, "with specificity, what information it would need to reverse its denial." Dkt. 19 at 27 (citing *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014)). Plaintiff is incorrect that Liberty Life did not specify what materials to submit in support of her appeal; the 2018 termination letter stated that if Plaintiff sought review of the termination decision, she should submit "[o]ffice notes, test results, imaging reports, procedure reports, medications prescribed, physical therapy notes, copy of your claim file with Social Security Disability, and specific restrictions and limitations from all of your treating providers[.]" AR 53. The letter additionally directed that Plaintiff "should also provide any additional information that [she] fe[lt] w[ould] support [her] claim." *Id.* Citing *Gagliano*, 547 F.3d at 237, Plaintiff contends that the termination letter provided a "boilerplate statement" that is insufficient to satisfy ERISA's notice requirements. Dkt. 19 at 25. Plaintiff's reliance on *Gagliano* is misplaced. In that case, the Fourth Circuit held that a single sentence in a termination letter informing the claimant that "we would be happy to consider any additional information your client wishes [the Administrator] to review" was not compliant, or even substantially compliant, with ERISA's notice requirements. *Gagliano*, 547 F.3d at 237.

In this case, Liberty Life's list of materials is far more descriptive and substantial than merely telling Plaintiff that Liberty Life would consider "any additional information" she wished it to review. Moreover, Liberty Life's first appeal letter to Plaintiff upholding its 2018 termination

decision further advised Plaintiff that the following was still missing from her claim file, and that she should, therefore, submit: "physical examinations, diagnostic test results, treatment notes, mental status evaluations, psychiatric testing, cognitive testing or other medical documentation to support that your symptoms are of such severity, frequency, and duration that they resulted in restrictions or limitations rendering you unable to perform the fulltime duties of 'any reasonable occupation.'" AR 61. In support of her second appeal, Plaintiff submitted only one additional document: a written certification from the Maryland Medical Cannabis Commission, dated December 12, 2018 and signed by a Dr. Randy DeCarlo. *See* AR 66. Throughout the appeal process, Liberty Life kept Plaintiff apprised as to the status of her claim and gave her ample time and opportunity to submit additional materials in support of her claim.[20] The Court is not persuaded that Liberty Life failed to put Plaintiff on notice as to what materials to submit in support of her claim.

Finally, Plaintiff argues that she did not receive a full and fair review of her appeal because Liberty Life did not timely provide her complete claim file.[21] Dkt. 19 at 28, 30. When a claimant

---

[20] *See, e.g.*, AR 3 (on January 8, 2019, Liberty Life acknowledged via letter Plaintiff's intent to appeal its denial of benefits); AR 5, 1250 (on January 24, 2019, Liberty Life confirmed via letter and phone call to Plaintiff that it had received Plaintiff's appeal and was waiting for her to submit additional information to support her appeal); AR 7, 1250 (on January 29, 2019, Liberty Life notified Plaintiff via letter and phone call that her appeal and file were being forwarded to its Appeal Review Unit for an "independent review of [her] claim eligibility" and confirmed that it received all of Plaintiff's materials); AR 10 (on April 15, 2019, Liberty Life confirmed via letter to Plaintiff that it was waiting to receive additional information from Plaintiff to be considered as part of her second appeal); AR 12 (on May 7, 2019, Liberty Life notified Plaintiff via letter that her second appeal and file were being forwarded to its Appeal Review Unit); AR 17 (on June 6, 2019, Liberty Life notified Plaintiff via letter that it required more time to complete its review).

[21] Plaintiff argues in a cursory manner that the Red Cross also failed to timely provide her with Plan documents. Dkt. 19 at 30. Under ERISA, the plan administrator, upon written request of a plan participant, must provide "a copy of the latest updated summary, plan description, and [other plan documents]." 29 U.S.C. § 1024(b)(4). Plaintiff alleges that she requested Plan documents on April 17, 2020, but did not receive the SPD until June 29, 2021. *Id.*; *see also* AR 85–90.

is denied disability benefits, under ERISA, they are "entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(g)(1)(vii)(D).  A document or record is relevant, in part, if it was "relied upon in making the benefit determination" or was "submitted, considered, or generated in the course of making the benefit determination." 29 C.F.R. § 2560.503-1(m)(8).

As Defendant asserts and as shown by the record, whenever Plaintiff requested her claim file and Plan documents, Liberty Life responded in a timely manner.  For example, on March 28, 2019, Plaintiff emailed Liberty Life requesting her claim file and Plan documents.  AR 30.  On April 8, 2019, Liberty Life provided Plaintiff with her claim file, including the names and reports of all the people with whom Liberty Life consulted during the review.[22]  AR 15.  On November 8, 2019 and on November 19, 2019, in response to requests from Plaintiff, Liberty Life again provided Plaintiff with a copy of her claim file.  AR 1216, 1225.  And on March 6, 2020, in

---

Plaintiff apparently refers to the 2006 Plan, which Defendant contends is not relevant and did not originally include in the AR, though subsequently produced copies. *See* Dkt. 13 ¶¶ 17–18.  As discussed above, the 2006 Plan was not the Plan in effect at the time of Liberty Life's 2018 termination decision. *See supra* pp. 12–13.  Moreover, under ERISA, the Plan Administrator is only required to provide plan participants with "a copy of the *latest updated* summary[ and] plan description[.]" 29 U.S.C. § 1024(b)(4) (emphasis added); *see also Shields v. Local 705, Int'l Bhd. of Teamsters Pension Plan*, 188 F.3d 895, 903 (7th Cir. 1999) ("[O]utdated plan descriptions do not fall into any of the categories of documents a plan administrator must provide to plan participants under section 1024(b)(4).").  Plaintiff received the 2018 Plan on or about April 9, 2020.  AR 124–27.  The Court is not persuaded that this constitutes a violation or an abuse of discretion under ERISA.

[22] In its April 8, 2019 letter, Liberty Life advised Plaintiff that she would need to contact the Red Cross for copies of the Plan documents.  AR 15.  The next day, on April 9, Liberty Life requested via email that the Red Cross mail Plaintiff hard copies of the Plan documents, and the Red Cross confirmed that it sent Plaintiff the documents.  AR 124–27, 1233–34.  In a March 6, 2020 letter responding to a March 4, 2020 letter from Plaintiff's counsel, Liberty Life repeated its earlier instructions to request Plan documents from the Red Cross.  AR 80–83, 1218–20.

response to a March 4, 2020 letter from Plaintiff's counsel, Liberty Life again provided a copy of Plaintiff's claim file. AR 80–83, 1218–20.

Plaintiff argues that because her claim file did not include claim handling notes from Aetna and MetLife, her appeal did not receive a full and fair review. Dkt. 19 at 28. However, Liberty Life's 2018 termination decision did not rely upon old claim handling notes generated by a prior Claim Administrator; it turned on new evidence generated once Liberty Life took over as Claim Administrator in 2017.[23] *See* 29 C.F.R. § 2560.503-1(g)(1)(vii)(D), (m)(8) (a document or record is relevant if it was relied upon, submitted, considered, or generated "*in the course of making* the benefit determination" (emphasis added)). There is no merit to Plaintiff's argument that Liberty Life failed to timely provide her claim file and that such a failure precluded her ability to seek a full and fair review of her claim.[24]

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. 25) is

---

[23] Moreover, even if ERISA did require the production of old claim handling notes as part of Plaintiff's claim file, Plaintiff has not shown that this procedural violation "was prejudicial to a degree sufficient to constitute an abuse of discretion[.]" *Odle v. UMWA 1974 Pension Plan*, 777 F. App'x 646, 651 (4th Cir. 2019).

[24] Plaintiff additionally argues that the Red Cross, as Plan Administrator, breached its fiduciary duty by failing to preserve and transfer her complete claim file from Aetna to MetLife to Liberty, which she contends precluded a full and fair review of her disability claim. Dkt. 19 at 29–31; Dkt. 1 ¶¶ 44–55. Plaintiff's claim alleging breach of fiduciary duty appears to simply reiterate her claim alleging improper denial of benefits. "As the Supreme Court explained, ERISA's fiduciary duty provisions are primarily concerned with protecting the integrity of the plan, which in turn protects all beneficiaries, rather than remedying individual wrongs." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 458 F.3d 359, 362 (4th Cir. 2006) (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141 (1985)). Thus, the Court finds no merit to Plaintiff's breach of fiduciary duty arguments.

**GRANTED** and Plaintiff's Motion (Dkt. 18) is **DENIED**.

It is **SO ORDERED.**

August *18th*, 2022
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge